UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LABORERS' PENSION TRUST FUND - DETROIT
AND VICINITY, Trustees of; LABORERS'
VACATION AND HOLIDAY TRUST FUND -
DETROIT AND VICINITY, Trustees of; LABORERS'
AND POURED CONCRETE WORKERS
INSURANCE FUND, Trustees of; LABORERS' AND
POURED CONCRETE WORKERS INDUSTRY
STEWARD FUND, Trustees of; LABORERS'
ANNUITY FUND- DETROIT & VICINITY, Trustees
of; and MICHIGAN LABORERS' TRAINING FUND,
Trustees of,

Case Number 07-12859
Honorable David M. Lawson

                Plaintiffs,

v.

BRICK FACED CONCRETE WALLS, INC.

                Defendant.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

    In this case, the plaintiffs, trustees of several benefits funds established pursuant to the Employment Retirement Income Security Act of 1974 (ERISA) and the Labor Management Relations Act, seek to collect fringe benefit payments they claim are owed by the defendant under the terms of a collective bargaining agreement (CBA) the defendant entered with Locals 334 and 1076 of the Laborers' International Union of North America, AFL-CIO. In a motion for partial summary judgment, the defendant contends that the amounts claimed by the plaintiff are overstated because certain workers are not covered by the CBA and collection of other amounts is barred by the applicable statute of limitations. The Court heard oral argument on the motions on April 3, 2008 and now finds that summary judgment is not appropriate on the statute of limitations defense

because the record presents material fact issues on when the plaintiffs discovered the claim, which will determine the claim accrual date. However, the Court also finds that although some of the defendant's employees fall within the plain terms of the CBA, the CBA does not extend to the defendant's truck driver employees, so benefit payments attributed to them may not be collected. Therefore, the Court will grant in part and deny in part the defendant's motion for partial summary judgment.

I.

The trustees filed this action on July 10, 2007 alleging that the defendant, Brick Faced Concrete Walls, Inc, underpaid its obligations under a CBA owed to the Laborers' Union benefit funds from January 2001 through the date of the complaint. The defendant company was incorporated in 1971, and from at least 1979 until 2006, when the employees voted to become non-union, the defendant was a member of the Poured Concrete Wall Association (PCWA), and its employees were members of Laborers Local 334 and 1076. Throughout that time, the PCWA negotiated a series of CBAs with the Laborers' Union on behalf of its member companies, the latest version of which covered the period from 2003 through 2006.

The defendant is engaged in the business of constructing poured concrete barrier walls, also known as screen walls and designer walls, that separate residential and commercial properties. These walls are often mandated by local zoning ordinances to provide privacy for residences from adjacent commercial establishments. Although the walls are made from concrete, they are stamped or formed so that they appear to be made of brick. Forms are used on the job site that achieve this effect. The forms are erected, the concrete is poured, then the forms are removed, and the wall is finished. The forms themselves come in two-foot by two-foot sections, and they are bolted together

to make a wall section of the desired height and length. There is a fact dispute over whether the forms are bolted together in the defendant's yard and transported to the job site, or trucked to the job site and assembled there. The defendant believes this dispute is material to one of the disputes concerning whether certain of its employees are covered by the CBA, although the Court finds that the contract language renders this fact contest immaterial. Whether the forms are assembled in the defendant's yard or on the job site, the work is performed by general laborers.

The CBA at issue in this case is "applicable within the territorial jurisdiction of the Union and shall cover work, including work in the yards, historically performed by laborers, herein called 'Employees' or 'Laborers' for Contractors in the poured concrete wall industry." Def.'s Mot. Summ. J., Ex. A at 4. In addition to "work in the yards," the CBA also covers labor performed at the job site, as set forth in the following provision:

> 4. Contracting and subcontracting of all poured concrete wall work including preparatory work, back work and all work covered by this contract to be done at the site of construction shall be performed by Contractors having a written agreement with the Union.

*Id.* at 7.

The contract also prescribes different labor rates for residential construction jobs and commercial jobs, the latter claiming higher rates of pay and corresponding benefit contributions.

> "Residential" construction is herein defined as all work in connection with: construction, alteration or repair of all residential units such as single dwellings, duplexes, row houses, town houses and walk-up apartments. This agreement also covers congregate living units and motels up to three (3) stories of residential-type construction which have no meeting or full service restaurant facilities. This agreement does not cover those housing units constructed of reinforced concrete, and/or steel-framed units normally referred to as "high rise," and are normally in excess of three stories, and any work of a subdivision of the trade covered by a collective bargaining agreement in effect on the date of this Agreement.

> "Residential" construction does not cover funeral homes, clinics, restaurants, rest homes, nursing homes, stores or similar work traditionally done under the Commercial wage rates.

*Id.* at 9.

The CBA applies to all covered work performed by the signatory companies, regardless of whether its workers or subcontractors are union members. On that point, the CBA states:

> Any Contractor signatory to or bound by this Agreement, shall, if he subcontracts any work done or to be done at the site of construction and under the jurisdiction of the Union, be responsible for compliance with his [sic] contract by any person, firm or corporation to whom such work is subcontracted. This shall mean that any Contractor signatory to or bound by this Agreement subcontracting work under this contract must give notice to the Union that such work is being subcontracted, to whom the work is being subcontracted, and the Contractor hereby agrees that he will become surety for and assume all obligatins [sic] for anyone to whom work is subcontracted if that subcontractor does not pay all of the wages, fringe benefits and other conditions called for by this Agreement.

*Id.* at 16.

The company and the trustees have had disputes in the past over fringe benefit payments, the latest of which resulted from an audit that covered the period ending December 31, 2000. That dispute was resolved without litigation in 2004. However, suspicions over nonpayment of benefits by the defendant prompted another audit in March 2005, which was intended to cover the period beginning where the previous audit left off. Those suspicions were characterized by William Ray, the Collection Administrator for the Laborers' Joint Delinquency Committee, in his September 23, 2005 letter to Local 334 official Scott Covington:

> It seems that we are having a difficult time connecting on the phone, and I wanted to relay some background on Brick Faced Wall before your call to Duane.
>
> There are several issues to be dealt with before the auditor sends out the bill. Many are interconnected. I'll try to be as brief as possible.

1. In the summer of 2003 Brick Faced Wall was forming and pouring a building foundation in Romulus. John Gregg called me about this job and informed me that Brick Faced had several laborer employees on the project without union cards and that were not receiving fringe benefits. He would not take any pictures of the employees and I drove down to the site to do so. Duane's brother Eric would not let the employees give me their names and instructed them to leave the job. I waited on site for quite some time and watched the employees drive past the job many times. Later I spoke with Mr. Bucci and John Dickenson about the problems on this project. Ultimately Duane (for the first and only time) paid commercial rates on his two "union" employees for the project, but failed to pay any fringe benefits on any other laborers working on site.

2. Local 1076 signed a laborer employee to a check off last year (a copy of which I have already faxed to you). The employee later signed an affidavit that he didn't do any laborers work, which 1076 disagrees with. The most important fact about this employee is that, whatever he doing, he does not appear on the Brick Faced Wall payroll. When I spoke with Duane about this employee he said that he paid the employee cash.

3. Last year a former employee of Brick Faced told me that all overtime for the time that he was an employee (over 6 years) was paid in cash. He said he has slips that were included in the envelopes, but is afraid to produce them to me. He is from Europe and is afraid of deportation problems that may or may not arise from that fact that he may have some unclaimed income on his tax reporting forms.

4. About a week and a half ago, I was driving by Amato's Construction to see if there were any signs of activity. Across the street was Brick Faced Wall, with a dumpster screen wall waiting to be buttoned up and a concrete truck on site. This was at 5 PM. They were probably going to be on site another hour (not counting the time it took to return the truck back to the yard in Novi). There were at least 3 employees on site. I did not stop on the site and speak with the employees. The screen wall was not along the property line, it was in the parking area. 3 problems here; Brick Faced is only reporting on 1 laborer employee, (I suspect the company will not report on the others), the company never reports overtime (which starts at 4:30 PM), and the company only pays residential rates. As we discussed during the last audit, two other companies that do similar work are paying commercial rates for this type of work. You seemed to think at the time that because most of Brick Faced Wall's work is along the property line separating commercial and residential that Brick Faced could pay residential if they so choose. I think this is a problem because of the equal treatment clause in the agreement.

> These are the issues that we need to address before the audit is completed: failure to report on (or misclassify) laborer employees, cash payments, and correct contribution rates. Please call me with the direction you would like us to take after you have had a chance to review this information.

Def.'s Mot., Ex. C, Drzazgowski Aff., Ex. 2. The audit concluded that from January 2001 to March 2005, the defendant underpaid the funds $210,552.83. The principal areas of dispute are (1) the payment of laborers (and corresponding benefits) at residential rates on jobs deemed by the trustees to require commercial rates; (2) the obligation to pay benefits for laborers' work done in the defendant's yard (as opposed to work on the job site, which is not in dispute); and (3) whether benefit payments are due for truck drivers, who also might perform other work falling within the definition of general labor.

In its motion for partial summary judgment, the defendant argues that it is entitled to judgment on each of these disputed items as a matter of law. It also argues that the dispute over benefit obligations for all workers arising before July 10, 2001 is barred by the statute of limitations.

II.

A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). Thus a factual dispute which "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). "[T]he party opposing the summary judgment motion must 'do more than simply show that there is some "metaphysical doubt as to the material facts."'" *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Ibid.* (quoting *Anderson*, 477 U.S. at 252) (internal quotation marks omitted).

A.

The parties agree that the applicable statute of limitations period is six years. *See Santino v. Provident Life and Acc. Ins. Co.*, 276 F.3d 772, 776 (6th Cir. 2001) (citing Mich. Comp. Laws § 600.5807(8)); *Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 706 (6th Cir. 1988) (citing M.C.L. § 600.5807(8)). "Although the statute of limitations may be borrowed from state law, it is federal law that determines the date on which a statute of limitation begins to run." *Michigan United Food & Commercial Workers Unions & Drug & Mercantile Employees Joint Health & Welfare Fund v. The Muir Co.*, 992 F.2d 594, 598 (6th Cir. 1993) (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)).

"Because the statute of limitations is an affirmative defense, the burden is on the defendant to show that the statute of limitations has run." *Campbell v. Grand Trunk Western R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001). Once the defendant has established that the complaint was filed beyond the period of limitation, the burden shifts to the plaintiff to show an exception that would permit the action to proceed. *Ibid.*

In this case, the trustees contend that they did not discover their claim for delinquent benefits owed by the defendant until it completed its audit in May 2006. The Sixth Circuit applies the discovery rule to determine when a statute of limitations in an ERISA action begins to run. *Muir Co.*, 992 F.2d at 598. "[T]he central question is when the [plaintiff funds] should have become aware of [the defendant's] underpayments." *Ibid.* The plaintiffs bear the burden of showing that they did not become aware of the defendant's defalcations until the later date. *Campbell v. Upjohn Co.*, 676 F.2d 1122, 1128 (6th Cir. 1982) (holding that the burden of establishing tolling or fraudulent concealment rests on the party seeking to avoid the application of a statute of limitations); *Drazan v. United States*, 762 F.2d 56, 60 (7th Cir. 1985) (holding that the "plaintiff must show that she had no reason to believe that she had been injured by an act or omission by the [defendant]"), *cited with approval in Campbell*, 238 F.3d at 775.

Both parties cite *Muir Co.* in support of their respective positions. In that case, the benefits trustees received monthly invoices that contained information that could have led to the discovery of contribution discrepancies. The benefits trust "argue[d] that it had no particular and specific reason to doubt the accuracy of Muir's reports until it completed its audit" six years later. *Muir Co.*, 992 F.2d at 598. The Court discussed the competing considerations in the application of the discovery rule in that case:

> Favoring the Welfare Fund is the fact that the employer's mistakes in this case were various and not the result of a single systemic error as, for example, occurred in Beth Energy, where the accounting system for worked lunch hours was changed to the Funds' detriment. With this distinction in mind, it would be possible to find that the Welfare Fund had no "reason to awaken inquiry" and that its failure to perform an earlier audit did not amount to a lack of due diligence. *Sheet Metal Workers, Local 19* [*v. 2300 Group, Inc.*], 949 F.2d [1274,]1282 [(3d Cir. 1990)].
>
> On the other hand, the facts in this case show that the Funds, by conducting an internal audit using information already within their possession, had the ability to discover probable discrepancies and underpayments at any time after the employer's monthly reports were received. It was by this very method that the Funds obtained the information necessary to support this action. Furthermore, the Funds knew from their previous audit in 1983 that these kinds of employers' errors were likely to occur and that only an audit could discover them.

*Id.* at 599. The Court concluded, "[u]nder the particular facts of this case, the Welfare Fund had a duty to inquire into the possibility of errors in employer monthly reports because it knew that such errors would occur." *Id.* at 600.

Similarly, the defendant in this case claims that it submitted "monthly reports" to the plaintiff funds, but there is *no* evidence in the record about these reports. Without more information, it is impossible to know whether the plaintiffs had information in its possession that should have "awakened inquiry," or when that information came into the possession of the plaintiffs. Moreover, the parties had just resolved a dispute over benefits contributions in 2004, and there is nothing in the record to suggest that the plaintiffs' suspicions should have been re-aroused.

The only piece of evidence presently in the record on point is the March 9, 2005 letter sent by the auditor stating that employee records were needed to conduct a new audit. This letter provides some support for the plaintiffs' position that it did not have sufficient information to know of the discrepancies. On the other hand, the plaintiffs are complaining about issues that were raised in past audits, so even if the monthly reports did not contain sufficient information to prove

misconduct, there was a "particular and specific reason to doubt the accuracy" of the reports. *See Muir Co.*, 992 F.2d at 598. Nonetheless, without the monthly reports or other evidence in the record that would put the plaintiffs on notice that the defendant's past practices continued into the new period, or that the defendant otherwise was noncompliant with the CBA's benefit contributions provisions, the Court must find that the plaintiffs' claims did not accrue until sometime in the beginning of 2005. That time frame falls well within the six-year statute of limitations. The defendant's motion for summary judgment on statute of limitations grounds, therefore, cannot be granted.

B.

The defendant also argues that the CBA does not obligate it to make benefits contributions for laborers who perform work in its yard or for truck driver employees, and that the contract language justifies contributions on many of the disputed claims at residential rates rather than the higher commercial rates. "[F]ederal law is the exclusive law used to interpret the duties and obligations contained within collective bargaining agreements." *Northwestern Ohio Adm'rs, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018, 1030 (6th Cir. 2001). "A collective bargaining agreement is not governed by the same principles of interpretation applicable to private contracts." *Int'l Union, United Mine Workers of America v. Apogee Coal Co.*, 330 F.3d 740, 744 (6th Cir. 2003) (internal quotations and citations omitted); *see also United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 578 (1960) ("The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate."). "[T]raditional rules of contract interpretation" are employed to the extent they are consistent with "federal labor policy." *Cincinnati Typographical Union No.*

*3, Local 14519 v. Gannett Satellite Info. Network, Inc.*, 17 F.3d 906, 909 (6th Cir. 1994). "Whether the language of a written agreement is ambiguous is a question of law that may be resolved summarily." *Apogee Coal*, 330 F.3d at 744 (internal quotations and citations omitted).

The Sixth Circuit has explained:

> In interpreting collective bargaining agreements, we consider the language of the agreement, the context in which that language appears and other traditional canons of construction. *McCoy v. Meridian Auto. Sys.*, 390 F.3d 417, 422 (6th Cir. 2004). If, after applying these rules of interpretation, the contract remains ambiguous, we permit the parties to introduce extrinsic evidence about their original understanding of the contract's terms.

*Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 441 (6th Cir. 2007).

The general rule is that contract provisions are ambiguous if they are "reasonably and fairly susceptible to multiple understandings and meanings." *Equitable Life Assur. Soc. v. Poe*, 143 F.3d 1013, 1016 (6th Cir. 1998). Legal ambiguity requires "two or more reasonable interpretations." *GenCorp v. American Int'l Underwriters*, 178 F.3d 804, 819 (6th Cir. 1999). Disagreement between the parties does not necessarily constitute ambiguity. *Ibid*. However, a statement can become ambiguous when read in conjunction with the agreement as a whole. *Int'l Union, United Auto., Aerospace and Agr. Implement Workers of America v. BVR Liquidating, Inc.*, 190 F.3d 768, 774 (6th Cir. 1999).

When a particular contract section is found to be ambiguous, "the court may look to other words and phrases in the collective bargaining agreement for guidance." *Maurer v. Joy Technologies, Inc.*, 212 F.3d 907, 915 (6th Cir. 2000) (quoting *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479-80 (6th Cir. 1983)). The Court also may consider industry custom and usage, and past practices between the parties. However, "past practice or custom should not be used to interpret or give meaning to a provision or clause of the collective bargaining agreement that is clear and

unambiguous." *Beacon Journal Pub. Co. v. Akron Newspaper Guild, Local Number 7*, 114 F.3d 596, 601 (6th Cir. 1997).

1.

The defendant argues that it is not obligated for benefit payments to workers who performed their jobs at the defendant's yard. It insists that it has never paid contributions for laborers' work performed in its yard, such as assembling and disassembling forms, cleaning and restoring forms, loading and unloading the forms from flatbed trucks. It points to the following language in the CBA, "work in the yards, historically performed by laborers, . . ." and reasons that since yard work was not historically performed by laborers, it has no obligation for such contributions under the present contract.

The parties have filed affidavits that raise a dispute over whether the concrete forms were bolted together at the defendants' yard, as it claims, or rather were transported to the job sites and assembled there. The defendant contends this makes a difference, apparently acknowledging that such work done at the job site is covered work performed by laborers, while contending that the same work performed at its yard is not. However, the Court finds this fact issue is immaterial because the dispute over the obligations to pay contributions for yard work can be resolved solely by reference to the CBA.

In its full context, the operative phrase of the CBA states that the agreement "shall cover work, including work in the yards, historically performed by laborers, herein called 'Employees' or 'Laborers' for Contractors in the poured concrete wall industry." The defendant's read ignores the punctuation in the text, which sets off the phrase "including work performed in the yards" as a dependent clause. The defendant would disregard the second comma and read the language to cover

only "work in the yards historically performed by laborers." However, parties ignore punctuation in contractual interpretation at their peril. *See Citizens Ins. Co. of America v. MidMichigan Health ConnectCare Network Plan*, 449 F.3d 688, 693 (6th Cir. 2006) (interpreting an insurance contract by employing "a grammatical analysis" and considering comma placement). The plain reading of the text accounting for the punctuation extends the contract to *all* work "historically performed by laborers," "including work performed in the yards." In other words, if work is historically performed by laborers, the contract covers it *even if* it is performed in the employers' yards.

To the extent that the defendant seeks in its motion to exclude yard work from the contribution calculations, it must be denied.

2.

The plaintiffs concede that individuals who function solely as truck drivers are not covered by the CBA. Rather, they argue that the truck drivers likely do not function solely as such, and they do laborers' work – that is, covered work – at the yard and when they get to the job sites. The defendant argues that the plaintiffs have put forth no facts showing that the defendant's truck drivers were engaged in other activities.

The plaintiffs rely on three pieces of evidence to defeat the motion for summary judgment: the opinion of William Ray that it would be rare for workers in the industry to only be truck drivers; the practices of two rival companies who claim they build walls in a similar fashion to the defendant; and the employees of those competitors who drive the trucks and perform other tasks and who are covered by the competitors' contributions. The problem with this evidence is that the affidavits do not explain how the affiants have personal knowledge of the practices of the defendant. Federal Rule Civil Procedure 56(e)(1) mandates that "[a] supporting or opposing affidavit must be made on

personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Moreover, there is no evidence that industry practice is uniform, or that the defendant's workers cleave to the pattern suggested by the practice of its competitors. Without producing facts to show that the defendant's truck drivers performed tasks other than truck driving, the plaintiffs have not shown that those individuals ever performed covered work, and therefore there is no evidence to support the claim that contributions are owed for them. Therefore, the defendant's motion for partial summary judgment will be granted as to the contributions claimed for the truck driver employees.

3.

The dispute over residential versus commercial rates focuses on the character of the jobs in which barrier walls are erected to separate commercial establishments from adjacent residential properties. The defendants argue that these jobs historically have been treated as residential construction, and since the barriers benefit the residential land by providing privacy, it falls within the CBA's definition of "all work **in connection with** construction, alteration or repair of all residential units . . . ." Moreover, the defendant argues, the plaintiffs acquiesced in the payment of residential rates for such work when a Local 334 official averred that "a screen or barrier wall along a property line separating commercial and residential properties require fringes at commercial rates." Def.'s Mot., Ex. E, J. Scott Covington Aff. at 3. The defendant also offers an affidavit from David Car, who twenty years ago owned a barrier wall business, stating that the "contract language at issue today has been fundamentally the same for many years, including back when my company did poured brick-designed walls." Def.'s Mot., Ex. F, David Car. Aff. at 2.

To counter that, the plaintiffs submitted an affidavit from Michael DeVergilio, business manager of Laborers Local 1076 and until recently trustee of the funds, who stated:

> I am aware that in the resolution of an audit covering the 1998 - 2000 time period, defendant was permitted to pay its contributions at residential rates. However, . . . this was not my decision or the decision of the plaintiff Funds. Instead, this action resulted from the decision of Local 334, Laborers, which had filed a grievance against defendant as a result of the unpaid audit, to accept the contributions at the residential rate in order to resolve the case. I opposed the decision at that time and continue to oppose the decision, both as a Trustee of the funds and as the Business Manager of Laborers Local 1076.

Pl.'s Resp., Ex. B, DeVergilio Aff. ¶ 3. The plaintiffs also submitted an affidavit by fund collection administrator William Ray III, which states:

> I observed the defendant forming above[-]grade walls for a building near Romulus. After I confronted the defendant about the number of non[-]union laborers on the site and that he needed to pay commercial rates on this job, Brick Faced finally remitted a small amount of fringes benefits at the commercial rate for the first and only time in the company's history. However, the defendant did not remit contributions on the non[-]union laborers working at the site. Another occasion, I observed them building a barrier wall around a trash receptacle in the middle of a parking lot of a commercial building.

Pl.s' Resp., Ex. C, William Ray Aff. ¶ 4. Mr. Ray and Nathan Wilkins, Business Representative for Laborers 1076, both state that Poured Brick Wall is another company that "performs the same work" as the defendant, and that this company "always has contributed to the Funds for such work at the commercial rate." Pl.s' Resp., Ex. C, William Ray Aff. ¶ 7; Pl.'s Resp., Ex. D, Nathan Wilkins Aff. ¶ 6. Keith Tobel, vice president of Poured Brick Walls, Inc., submitted an affidavit where he declares that the defendant's work is identical to his company's, and his company "always has contributed to the plaintiff Funds at the commercial rate . . . even if the wall was between a commercial establishment and residential structures." Pl.'s Resp., Ex. E, Keith Tobel Aff. ¶ 4. Finally, Mike Moretti, the owner of the Moretti Foundation Company, states:

> When Moretti Foundation Company, Inc. has formed a barrier wall on a commercial job site, it always has contributed to the plaintiff Funds at the commercial rate set forth in the Poured Concrete Wall Association agreement even if the wall was between a commercial establishment and residential structures.

Pl.s' Resp., Ex. F, Mike Moretti Aff. ¶ 4.

The defendant argues that this dispute can be resolved by consulting the contract language and specifically points to the definition of residential construction as "all work in connection with: construction, alteration or repair of all residential units such as single dwellings, duplexes, row houses, town houses and walk-up apartments." By negative implication, commercial construction is everything else. But as can be seen from the nature of the dispute, the question presented is not one of contract interpretation so much as it is in the application of the CBA's unambiguous terms.

Is constructing a barrier wall on commercial property work that is "in connection with [the] construction, alteration or repair of [a] residential unit[]"? Based on the affidavits presented, it appears that fact issues on this point abound. Certainly, summary judgment on this issue in favor of the defendant is not warranted by the present record. Moreover, it is difficult to accept the proposition that building a structure on commercial property, which is mandated by zoning laws as a condition of doing business, amounts to "construction, alteration or repair of [a] *residential* unit[]." The residential parcel may derive a benefit from the barrier wall, but no more than any parcel benefits from improvement of a neighboring lot. That incidental benefit does not convert the improvement to a construction, alteration, or repair project on or of that parcel itself.

In any event, the defendant has not shown that it is entitled to a judgment as a matter of law in its favor on the question whether residential rates should govern the contribution amounts in dispute.

III.

The Court concludes that the defendant has the better argument on the question of contribution payments claimed by the plaintiffs for the defendant's truck drivers. However, fact issues preclude summary judgment for the defendant on the question whether commercial or residential rates apply and on those claims from projects older than six years from the filing of the complaint in this case. The defendant's argument as to the obligation to pay fringe benefits for yard workers is defeated by the contract language itself.

Accordingly, it is **ORDERED** that the defendant's motion for partial summary judgment [dkt #11] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the plaintiffs' claims for benefit contributions from the defendant for work performed by employees classified as truck drivers is **DISMISSED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: April 28, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 28, 2008.

s/Felicia M. Moses
FELICIA M. MOSES